UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ADAM JOHNSON-ESTELLE and
ALYSSA JOHNSON-ESTELLE,

     Plaintiffs,

v.

MEIJER, INC. et al.,

     Defendants.

Case No. 24-11469
Honorable Laurie J. Michelson

---

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [26]**

---

Adam and Alyssa Johnson-Estelle, a Black married couple, went to a Meijer in March 2024 to purchase some groceries. A white store employee believed the Johnson-Estelles resembled another Black couple who had stolen from the store the day before. Thus, the Johnson-Estelles were confronted at check out and accused of shoplifting.

The Johnson-Estelles filed suit, alleging they were racially profiled and denied the full benefits and privileges of a public accommodation in violation of federal and state law. Meijer moves for summary judgment, arguing, primarily, that the store employees did not target the Johnson-Estelles based on race but because of their legitimate suspicions of shoplifting. On that point, the Court disagrees that no genuine issue of material fact exists.

For the reasons that follow, the motion for summary judgment is DENIED in part and GRANTED in part.

**I.**

On March 29, 2024, Adam and Alyssa Johnson-Estelle went to a Meijer in Chesterfield Township, Michigan to purchase ingredients for a barbeque. (*See* ECF No. 28-2, PageID.848.) The day before, a Black couple—believed to be Shipt shoppers[1]—stole some items from the store. (*Id.* at PageID.645, 774.) When the Johnson-Estelles entered the store, Asset Protection Specialist Sandra Matz, who is white, believed the Johnson-Estelles resembled the prior thieves. (*Id.* at PageID.649.) So Matz followed the couple around the store for several minutes, but she did not see them steal anything or do anything suspicious. (*Id.* at PageID.644.) Nevertheless, Matz called the Service Team Leader on staff that day, Greta Jackson, and told her that the couple from the day before was back in the store. (*Id.* at PageID.1079.) Matz instructed Jackson, who is Black, to review a picture of the suspected thieves from the day prior (which Matz emailed to the team) and to compare the image to the Johnson-Estelles. (*Id.* at PageID.647–648, 1082–1083.)

After reviewing the picture, Jackson went to find the Johnson-Estelles in the grocery area. (ECF No. 28-2, PageID.1083.) Jackson told Matz that the Johnson-Estelles were not a match. (*Id.* at PageID.1087.) The women's stories as to what happened next vary slightly. Jackson says she "knew right away" that the woman in the store did not match the picture, and that once she "got a good look," she knew the man was not a match, either. (*Id.* at PageID.1093.) So in Jackson's telling, she

---

[1] Shipt is an app through which individuals can hire someone to shop for and deliver their groceries to them. *See* https://perma.cc/RY8N-QBYP.

immediately told Matz that the Johnson-Estelles were not the people pictured in the photo, but that Matz "kept on saying" they were and insisted that Jackson approach the couple to confront them. (*Id.*; *see also id.* at PageID.1100–1101.)

Matz, on the other hand, denies telling Jackson to approach the Johnson-Estelles, and describes Jackson as being unsure about whether the couples matched. (*Id.* at PageID.655–656.) She does, however, recall Jackson telling her that it seemed like the Johnson-Estelles "were lighter skinned" than the couple from the day before. (*Id.*) In both women's telling, Jackson was less confident than Matz that the Johnson-Estelles were a match.

As Jackson and Matz had this discussion, the Johnson-Estelles made it to the self-checkout area and began ringing up their items, apparently unaware Meijer staff were surveilling them. (*Id.*)[2] They selected a kiosk in the corner of the self-checkout station. (*Id.* at PageID.932–933; *see also* ECF No. 26, PageID.473.)

While checking out, Adam accidentally scanned a mustard bottle twice, and needed a staff member to remove the double charge. (ECF No. 28-2, PageID.853.) And they also needed to present ID for a bottle of wine. (*Id.* at PageID.935.) So Alyssa pulled out her ID and the couple waved over to the staff—a group of women congregated in the corner—for help. (*Id.* at PageID.855.) But no one immediately

---

[2] Neither Adam nor Alyssa testified at their depositions that they felt they had been followed. But the store supervisor they later interacted with, Marshall Newburn, testified that the Johnson-Estelles reported to him that they had been "followed around" the store. (ECF No. 28-2, PageID.1012–1013.)

responded (*id.* at PageID.857) and the group of women appeared to be talking among themselves. (*Id.* at PageID.935–937.) That group included Matz and Jackson.

Eventually, after a few minutes of waiting, one of the employees—a "small Black lady," later identified as Jackson—approached the Johnson-Estelles. (*Id.* at PageID.857.) Jackson said something to the effect of "I wanted to talk to you guys anyway" as Alyssa handed Jackson her ID. (*Id.* at PageID.938.) But instead of checking the ID or removing the duplicate mustard charge, Jackson asked if they had been in the store the day before. (*Id.* at PageID.860.) When Adam told her this was their first time at that store, Jackson asked if he was a "Shipt shopper," to which Adam replied that he was not. (*Id.*) Jackson then explained that she believed the couple had been in the store earlier that week and stolen some items. (*Id.* at PageID.938.)

The couple reiterated that they had never been to the store before, let alone the day before. (*See id.* at PageID.938–939.) But they say Jackson "kept accusing [them] acting like it was [them]." (*Id.* at PageID.861, 939 (Alyssa deposition testimony, "[W]e keep going back and forth. We're getting nowhere. And she keeps studying the phone and then studying our face and I'm like, 'what?' And she goes, 'you really look like them.'").) Jackson asked "are you sure?" several times, which made Adam feel like she was "trying to coerce us to say like we took something or we were there before." (*Id.*) Jackson later testified that she "felt bad" about approaching the couple, "[b]ecause [she] knew it was not them" and she "told [Matz] that." (*Id.* at PageID.1096.)

4

Eventually Jackson showed Alyssa the picture she had of the thieves from the day before on her phone. (*Id.* at PageID.939.) Alyssa immediately told Jackson they did not match the picture. (*Id.*) And Jackson apparently agreed, claiming that she responded, "I know, you're right" and "apologized immediately." (*Id.* at PageID.1094.)

The Johnson-Estelles asked to speak with Jackson's supervisor. (*Id.* at PageID.940.) Alyssa testified that Jackson was reluctant at first and even said she might call the police. (*Id.* ("I said, do you want to call the police or something? She said, we may have to. And I said well, that's not telling me anything. Can you get your supervisor? She goes, okay fine.").) While she went to get her supervisor, Jackson told the Johnson-Estelles to wait at the register. (*Id.*; *id.* at PageID.962 ("She told me to don't leave, wait right there and she was pointing at me.").) Alyssa understood Jackson's conduct to mean, "Don't move, stay right there." (*Id.* at PageID.963.) They contemplated leaving the store, but were unsure if they could go or not. (*Id.*) Ultimately, they decided to wait for the supervisor, concerned that if they left the store, the staff would think they were "thieves on the run." (*Id.*)

After what "felt like a really long time[,]" Marshall Newburn, a Meijer Area Lead, approached the couple and reported that he was the "acting manager." (*Id.* at PageID.993, 941.) Alyssa says that as soon as Newburn came over, she asked him if he believed they looked like the couple in the picture. Newburn, who is also Black, agreed that while they might look similar to the picture, he could tell they were not the couple in the photo. (*Id.* at PageID.941 (Alyssa's testimony); *Id.* at ECF No. 28-2, PageID.1023–1024 (Newburn's Testimony ("Didn't look alike.")).)

Alyssa asked Newburn to explain their procedure for confronting suspected thieves, and inquired why they were not taken to a back room instead of being "asked in front of everyone." (*Id.* at PageID.942.) After some back and forth, Alyssa asked Newburn to clarify that they were "not under arrest or anything" because Jackson told her she "couldn't go" (*id.*), and Alyssa felt that Jackson's "behavior and attitude . . . gave [her] the impression that she couldn't [leave]." (*Id.* at PageID.953–954.) Newburn assured the couple that they were not under arrest and were free to leave. (*Id.*)

Alyssa told Newburn that her husband did not get a chance to see the picture on Jackson's phone, and asked Newburn to show the picture to Adam. (*Id.* at PageID.943.) Newburn did. (*Id.*) And Adam immediately observed that he and the man pictured were not the same. The men were not same skin tone or height, they had different hairstyles, and Adam had a "full beard" while the other man did not. (*Id.*) When Adam pointed this out, Newburn apparently agreed, responding, "yeah I know." (*Id.*) He apologized and offered the couple a discount on their items, which they accepted. (*Id.* at PageID.947, 1006–1007.) But before leaving the store, Alyssa called Meijer's 1-800 number to confirm they were free to leave, because she was "really scared of leaving . . . even though he said it was okay." (*Id.* at PageID.944.) After a customer service representative confirmed they were free to go, the couple finally left. (*Id.*)

On the way home, Alyssa, who was then pregnant,[3] began "cramping." (*Id.* at PageID.964.) By the time they got home, Alyssa was "bleeding" and "got scared that [she] was miscarrying." (*Id.* at PageID.265.) She "started immediately blaming the situation" on the incident and "yelled at [Adam] to get that [Meijer] crap" out of their house. (*Id.* at PageID.264.) So Adam and their son got in the car and went back to the Meijer where they returned all the items they had just purchased. (*Id.* at PageID.965.) Alyssa, fortunately, did not miscarry. (*See, e.g.*, *id.* at PageID.961.) But they have not returned to any Meijer since, because they "don't feel welcome" and do not want to give the company their money. (*See id.* at PageID.967.)

On June 4, 2024, they filed this suit, bringing claims of race discrimination in a public accommodation under Title II (42 U.S.C. § 2000a) and its Michigan analog (The Elliot-Larsen Civil Rights Act (ELCRA)), false imprisonment, and intentional infliction of emotional distress. (ECF No. 1.) Defendants now move for summary judgment on all counts. (ECF No. 26.) In response, the Johnson-Estelles agree to dismissal of their Title II and international infliction of emotional distress claims. (ECF No. 28.) But they maintain that a genuine dispute of material fact exists as to their ELCRA and false imprisonment claims sufficient to withstand summary judgment. The Court addresses each in turn.

---

[3] Nothing in the record suggests that any Defendants knew Alyssa was pregnant, nor do the Johnson-Estelles claim to have disclosed Alyssa's pregnancy to any of them.

## II.

The Court begins, as it must, with jurisdiction. The lone federal claim has been dismissed (ECF No. 28, PageID.600) and the parties are not diverse (ECF No. 1, PageID.2). But federal courts have broad discretion to exercise supplemental jurisdiction over state law claims, even where the only federal claim within the court's original jurisdiction is dismissed and the state law claims do not create diversity jurisdiction. *See, e.g.*, *Williams v. Addison Cmty. Schs.*, 168 F.4th 791, 796–97 (6th Cir. 2026). But there are some boundaries to that discretion. 28 U.S.C. § 1367(c). A district court may not exercise supplemental jurisdiction where it determines that it lacked jurisdiction over the federal claim in the first instance. *See, e.g.*, *Stanley v. W. Mich. Univ.*, 105 F.4th 856, 866–67 (6th Cir. 2024), or where the federal claim is "insubstantial, i.e. obviously frivolous." *Harajli v. Naser*, No. 06-10486, 2007 U.S. Dist. LEXIS 15297, *18–19 (E.D. Mich. 18, 2007) (citing *Gilder v. PGA Tour, Inc.*, 936 F.2d 417, 421 (9th Cir. 1991)). But courts nevertheless retain discretion to adjudicate pendent state law claims after the sole federal claim is dismissed on 12(b)(6) grounds—that is, where the federal claim was deficient at the outset. *See, e.g.*, *Arbaugh* v. *Y&H Corp.*, 546 U.S. 500, 514 (2006) ("[W]hen a court grants a motion to dismiss for failure to state a federal claim, the court generally retains discretion to exercise supplemental jurisdiction, pursuant to 28 U.S.C. § 1367, over pendent state-law claims.").

Courts are cautioned, however, to limit the exercise of this discretion to cases where "the 'interests of judicial economy and the avoidance of multiplicity of

litigation' outweigh [the court's] concern over 'needlessly deciding state law issues.'" *Moon v. Harrison Piping Supply*, 465 F.3d 719, 728 (6th Cir. 2006) (internal quotations omitted). Having considered the relevant factors, *see* 28 U.S.C. § 1367(c)(1)–(4), the Court finds that the interests of efficiency and fairness weigh in favor of the Court exercising supplemental jurisdiction over the Johnson-Estelles remaining state law claims. For one, neither party has addressed the issue or expressed a position either way. For another, the remaining claims do not raise "novel" questions of state law—only straightforward determinations of how the law applies to these facts. *See Williams*, 168 F.4th at 796 ("in the run-of-mine case, state claims that remain after all federal claims have been resolved will involve questions that are neither novel nor complex."). Moreover, the case has proceeded through significant discovery and motion practice before this Court, and the Court undertook significant work on the motion before learning of the jurisdictional issue.

For these reasons, the Court proceeds to the merits of Defendants' motion.

### III.

Under Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if the evidence permits a reasonable fact-finder to return a verdict in favor of the nonmovant, and a fact is "material" if it may affect the outcome of the suit. *See Bethel v. Jenkins*, 988 F.3d 931, 938 (6th Cir. 2021).

In making this determination, the Court must view facts in the record, and reasonable inferences that can be drawn from those facts, in the light most favorable to the nonmoving party—here, the Johnson-Estelles. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). This "'usually means adopting the plaintiff's version of the facts.'" *Tawney v. Portage Cnty.*, No. 21-3809 2022 U.S. App. LEXIS 16681, at *7 (6th Cir. June 15, 2022).

## A. ELCRA

Beginning with the Johnson-Estelles' claim under ELCRA, some background on the law and who bears the burden to prove such a claim is helpful.

Section 37 of ELCRA (Mich. Comp. Laws § 37.2302(a)), modeled after Title VII, prohibits discrimination based on race in public accommodations. *See, e.g., Rouch World, LLC v. Dep't of C. R.*, 987 N.W.2d 501, 507 (Mich. 2022) (noting that ELCRA was based on Title VII and that Michigan courts rely on federal law interpreting Title VII to interpret ELCRA.) In both contexts, courts apply the *McDonnell Douglas* burden-shifting framework to evaluate whether summary judgment on a claim of public accommodation discrimination is warranted. *See, e.g., Armstead v. Diederich*, No. 296512, 2011 Mich. App. LEXIS 1367, at *8 (Mich. Ct. App. July 21, 2011); *Branscumb v. Horizon Bancorp, Inc.*, No. 23-53, 2023 U.S. Dist. LEXIS 126412, *7 ("The Sixth Circuit has explained that courts should 'review claims of alleged race discrimination . . . brought under § 1981 and the Elliott-Larsen Act under the same standards . . . .'") (citing *Rogers v. Henry Ford Health Sys.*, 897 F.3d 763, 771 (6th Cir. 2018)).

10

Under that framework, the Johnson-Estelles bear the initial burden to proffer sufficient evidence to make out a prima facie case of discrimination. *Christian v. Wal-Mart Stores, Inc.*, 252 F.3d 862, 878 (6th Cir. 2001). If they do so, the burden then shifts to Defendants to articulate a legitimate, non-discriminatory reason for its actions. *Id.* at 879. And, if Defendants do so, the "presumption of discrimination falls away and the production burden shifts back to the [Johnson-Estelles,] who must prove by a preponderance that [Defendants'] stated reason was not its true reason, but was a pretext for discrimination." *Id.* (citing *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 142–43 (2000)). At all times, however, "the ultimate burden of persuading the trier of fact that [Defendants] intentionally discriminated" remains with the Johnson-Estelles. *Reeves*, 530 U.S. at 143 (citation omitted).

### 1.

So, what are the elements of the prima facie case the Johnson-Estelles must prove? Typically a valid claim of public accommodation discrimination under ELCRA has four elements: (1) discrimination based on a protected characteristic; (2) by a person; (3) resulting in the denial of the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations; (4) of a place of public accommodation. *Haynes v. Neshewat*, 729 N.W.2d 488, 492 (Mich. 2007).

But this analysis is somewhat altered in the context of commercial establishments, like Meijer. In cases like this one, both parties agree that the three-prong test established in *Christian v. Wal-Mart Stores, Inc.*, 252 F.3d 862, 872 (6th Cir. 2001) is the applicable standard. (ECF No. 26, PageID.480–481; ECF No. 28,

11

PageID.592.) Under that test, a patron who claims they were denied access to a commercial establishment on the basis of race need only show that they:

> (1) are members of a protected class;
>
> (2) sought to make or enforce a contract for services ordinarily provided by the defendant; and
>
> (3) were denied the right to enter into or enjoy the benefits or privileges of the contractual relationship in that:
>
>> (a) the plaintiff was deprived of services while similarly situated persons outside the protected class were not *and/or*
>>
>> (b) the plaintiff received services in a markedly hostile manner and in a manner which a reasonable person would find objectively discriminatory.

*Mosley v. Marriot Int'l, Inc.*, No. 21-10470, 2024 U.S. Dist. LEXIS 50505, *23 (E.D. Mich. Mar. 21, 2024) (citing *Christian*, 252 F.3d at 872) (emphasis added). What constitutes "markedly hostile" conduct is also subject to a three-part test. That is, courts consider whether the defendant's conduct was "(1) so profoundly contrary to the manifest financial interests of the merchant and/or her employees; (2) so far outside of widely-accepted business norms; and (3) so arbitrary on its face, that the conduct supports a rational inference of discrimination." *Christian* at 252 F.3d 871.

### 2.

There is no dispute that the Johnson-Estelles are members of a protected class and that they sought to enter a contract with Defendants (grocery purchases), which satisfies the first two *Christian* factors. The only element of the analysis that the parties dispute is prong three: whether the Johnson-Estelles were denied the right to enter into, or enjoy the benefits or privileges of, a contractual relationship with

Meijer. Defendants' argument is simple: Because the Johnson-Estelles successfully purchased all the items they sought at Meijer that day, they were not denied the "full use and enjoyment" of the accommodation. (ECF No. 26, PageID.482–483.)

This factual matter, though, is disputed. Alyssa testified in her deposition that while they were checking out, she contemplated running back to get some vegetables for a salad. (ECF No. 28-2, PageID.952.) But after their interactions with Jackson, she decided against it, feeling "scared" and that Defendants "didn't want [her] in that store." (ECF No. 28-2, PageID.953–954, 964.) So she did not purchase all the items she sought at Meijer that day. (*Id.* at PageID.946.)

It also does not warrant judgment as a matter of law. Defendants' hyper-technical reading of ELCRA has been rejected by many other courts. "The Michigan Court of Appeals has held that a plaintiff bringing an action under section 302 need not show an actual denial of goods or services. Rather, 'a violation of § 302(a) occurs where a person is denied full and equal enjoyment of the goods, services, facilities . . . provided by the defendant.'" *Karoumi v. TJ Maxx*, 408 F. Supp. 2d 454, 461 (E.D. Mich. 2005); *see also Clarke v. K-Mart Corp.*, 495 N.W.2d 820, 822 (Mich. Ct. App. 1992) ("We disagree with defendant and the trial court that a plaintiff must show an outright denial of access to a defendant's goods, premises, or facilities. Rather, we believe that a violation of § 302(a) occurs where a person is denied 'full and *equal* enjoyment of the goods, services, facilities,' . . . provided by the defendant.") (citations omitted); *see also Viau v. City of Troy*, No. 21-11169, 2022 U.S. Dist. LEXIS 114509, at *20 (E.D. Mich. June 10, 2022) ("the mere fact that [plaintiff] 'still

participated' in camp activities doesn't mean she was not denied the 'full and equal' enjoyment of those activities because her participation was marred by [defendant's] alleged race/national origin-based discriminatory conduct"); *Johnson v. Kroger Co.*, No. 18-1240, 2020 U.S. Dist. LEXIS 126174 at \*18 (S.D. Ohio July 17, 2020) ("Defendants [argue] that Plaintiff's claim fails as a matter of law because any of the alleged discriminatory conduct occurred after Plaintiff completed his purchase of groceries . . . because this Court applies *Christian*'s 'expanded formulation,' Defendants' argument fails.") (citation omitted).

Under *Christian*, the Johnson-Estelles need not show they were wholly *deprived* of the goods and services other Meijer customers receive; they may also prevail by showing that they were denied the "privileges and benefits" of the store by "receiv[ing] services in a markedly hostile manner." 252 F.3d at 871–72. And while a close call, construing the facts in the light most favorable to the Johnson-Estelles (*id.* at 878–79), they have offered sufficient evidence that Defendants' conduct was "markedly hostile."

For one, a reasonable jury could find that accusing customers of shoplifting with no basis other than a (questionable) belief they bear resemblance to prior thieves, sits "far outside of widely-accepted business norms." *See, e.g., Johnson*, 2020 U.S. Dist. LEXIS 126174, at \*22 (holding that a reasonable jury could find that "singl[ing] out" plaintiff "for surveillance for routine customer behavior and aggressively confront[ing] him for a shoplifting incident that never occurred" could be considered "markedly hostile"). At the very least, Defendants' conduct sat outside

14

Meijer's norms: Matz testified that under Meijer's loss prevention protocol, staff are not to approach suspected shoplifters "till they get *past* all points of sale. And we have to be sure they have what they have, probably because of lawsuits." (ECF No. 28-2, PageID.634 (emphasis added); *see also id.* at PageID.636 (Matz explaining that in order to stop a customer, staff "have to make sure that [the suspects] *have the merchandise on them*") (emphasis added); *see also id.* at PageID.637 (Matz explaining that under Meijer's protocol, they would not stop a suspected shoplifter unless "positive" that person was stealing and that they "have items on them that they are stealing.").)

Second, there is a fact issue as to whether Defendants' conduct was "so arbitrary" as to permit an inference of discrimination. In Matz's own admission, she only suspected the Johnson-Estelles of shoplifting because she believed they resembled the couple from the day before. (*Id.* at PageID.645, 693.) Her assessment was bolstered by her belief that the Johnson-Estelles walked down the same aisles and selected the same items as the suspected thieves. (*Id.*)

But Matz admits that she did not see the Johnson-Estelles steal or do anything suspicious. (*Id.* at PageID.644.) Nor was she certain that the Johnson-Estelles were the couple from the day before. (*Id.* at PageID.648.) Jackson, for her part, says she never thought the couples were the same—and she told Matz as much. (*Id.* at PageID.1087, 1089, 1093). And when asked to describe the resemblance between the couples, the only similarities Matz could recall was that "[t]hey were both—they were—there was a Black male and a Black female." (*Id.* at PageID.649; *see also id.* at

15

PageID.693 ("Q: Anything else besides the fact that they were African American, went down same aisles, grabbed the same stuff . . . went to [self check out] . . . that makes you believe they could have been the same people? A: No).)

The Court understands Defendants' position to be that their conduct was not arbitrary, but based on a legitimate belief that the Johnson-Estelles resembled the thieves from the day before. (ECF No. 26, PageID.484.) But at this stage, the Court must construe the facts in the light most favorable to the nonmovants, and the Johnson-Estelles (and Jackson) say the couple photographed stealing the day prior bore no resemblance to them. So does Newburn. The only person who apparently saw a meaningful resemblance between the couples was the only white staff member involved—Matz. Accepting as true that Matz was unjustified in thinking the Johnson-Estelles were a match for the past thieves, a reasonable jury could view her decision to target them in the absence of any suspicious activity (and indeed, while they were in the *process of checking out*) as arbitrary.

Finally, accusing Black customers of shoplifting, without any legitimate basis, is contrary to the financial interests of Meijer. False accusations of racial profiling may lead to customers leaving before completing transactions. *See, e.g.*, *Blount v. Whole Foods Mkt. Downtown Nash.*, No. 23-00343, 2025 U.S. Dist. LEXIS 215370, at *28 (M.D. Tenn. Oct. 31, 2025) (finding that falsely accusing an African American customer of shoplifting and thus forcing her out of store before she could buy anything was contrary to Whole Foods' financial interests). Or, as was the case here, (ECF No. 28-2, PageID.967), may result in a loss of loyalty and damage the company's

16

reputation. *See Thompson v. JP Morgan Chase Custody Servs., Inc.*, No. 09-127, 2011 U.S. Dist. LEXIS 33394, at *3 (E.D. Ky. Mar. 29, 2011) ("A jury could reasonably find that a bank does not act in its manifest financial interest or in step with accepted business norms when an employee accuses longtime customers of committing a crime without any basis in fact, and thereby risks losing its business and developing a reputation for that kind of conduct.").

For these reasons, the Court finds a genuine dispute of material fact as to whether Defendants treated the Johnson-Estelles with "marked hostility" and thus deprived them of the "full privileges and benefits" of their public accommodation in violation of the ELCRA.

### 3.

"Once [the Court] ha[s] determined that plaintiffs have produced evidence to establish their prima facie case, [it] must then consider the second phase of the burden-shifting framework, namely whether [Meijer] articulated a legitimate, non-discriminatory reason for its actions." *Christian*, 252 F.3d at 879. Meijer offers none. As such, the presumption of discrimination stands unrebutted, and Defendants' motion for summary judgment must be denied as a matter of law. *See, e.g., Kirilenko-Ison v. Bd. of Educ. of Danville Indep. Schs.*, 974 F.3d 652, 668 (6th Cir. 2020) (denying summary judgment "as a matter of law" where plaintiff satisfied a prima facie case and established a genuine dispute of material fact as to pretext.)

17

## B. False Imprisonment

Turning next to the Johnson-Estelle's false imprisonment claim. Under Michigan law, false imprisonment consists of three elements: "'[1] an act committed with the intention of confining another, [2] the act directly or indirectly results in such confinement, and [3] the person confined is conscious of his confinement.'" *Moore v. City of Detroit*, 652 N.W.2d 688, 691 (Mich. Ct. App. 2002).

Confinement in this context need not involve physical restraint. *Clarke*, 495 N.W.2d at 823 (quoting *Tumbarella v. The Kroger Co.*, 271 N.W.2d 284, 287 (Mich. Ct. App. 1978). Rather, plaintiffs may be "confined" in the absence of "manual restraint" where there is an "equivalent in some form of personal coercion." *Id.* Notably, the duration of the confinement is not relevant to the analysis of whether a restraint occurred. *See Janetsky v. Cnty. of Saginaw*, No. 166477/166478, 2025 Mich. LEXIS 1387, at *26 (Mich. July 25, 2025). But a plaintiff who voluntarily agrees to stay with the defendant is not "confined" for the purposes of such a claim. *Clarke*, 495 N.W.2d at 823.

The plaintiff bears the burden to show "that he has been imprisoned or restrained of his liberty." *Janetsky*, 2025 Mich. LEXIS 1387 at *28. Only if the plaintiff makes such a showing does the burden shift to the defendant to show this confinement was done with "lawful authority." *See id.*

### 1.

The Johnson-Estelles cannot meet their burden to show they were "confined." To be sure, the couple testified at their depositions that Jackson instructed them to

stay put when she went to retrieve her supervisor.  (ECF No. 28-2, PageID.865; *id.* at PageID.962 ("She told me to don't leave, wait right there and she was pointing at me.").)  And after being told by Jackson to wait in the self-checkout, they were unsure whether they could leave, so they discussed their options among themselves. (*Id.* at PageID.940.) Alyssa was "completely confused" as to what they should do and feared leaving, because she did not want Defendants to "think we're thieves on the run." (*Id.*) So Adam advised her that they "just wait and see if the manager says we can leave or not." (*Id.* at PageID.940–941.) This, they say, is proof that they were effectively coerced to stay. (*Id.* at PageID.598–599.)

But as an initial matter, the Johnson-Estelles *requested* to speak with Jackson's supervisor. (ECF No. 26-2, PageID.536.) So to the extent their time within the store was prolonged while Jackson retrieved Newburn, this was at their request. And when viewed in this context, Jackson's remark that the Johnson-Estelles should wait at the kiosk while she found Newburn sounds much less like a command and more like a simple logistic instruction. That is, if the Johnson-Estelles wanted to speak to her supervisor, Jackson would find him and bring him back to meet with the Johnson-Estelles in the same spot.

The Court understands that in the Johnson-Estelle's telling, they were stuck going back-and-forth with Jackson, and thus their decision to escalate the issue to a supervisor was born of necessity, rather than choice. But the record suggests there was another option available to the Johnson-Estelles: they could have left the store

19

without making any purchases and gone elsewhere. There is nothing to suggest Jackson would have kept them there had they not asked to speak with the manager.

What's more, coercion under Michigan law requires more than mere confusion over whether one is free to leave. Take *Clarke*, 495 N.W.2d at 823, where the Michigan Court of Appeals analyzed when "personal coercion" amounts to an impermissible arrest. There the court gave the example from the Second Restatement of Torts, wherein a store owner who suspects a customer of shoplifting seizes and retains the customer's purse to prevent her from leaving. *Id.* In that scenario, said the court, the customer is reasonably led to believe "she can leave the store only at the risk of losing the purse and the money and therefore remains in the store," and is thus "coerced" to stay. *See id.* (quoting Restatement (Second) of Torts § 40a (A.L.I. 1965).)

Those were not the stakes here. Defendants had not seized and retained any of the Johnson-Estelle's property—Jackson placed Alyssa's ID on the kiosk. (ECF No. 26-2, PageID.536.) The Johnson-Estelles had not yet purchased any items and thus faced no risk of leaving the store without items they had paid for. And while the Johnson-Estelles might have worried that Jackson could call the police on them, nothing Meijer staff said or did indicated that they *would*. Indeed, Jackson's statement that they "may have to" call the police falls far short of the kind of coercion contemplated in other cases. (*Id.*); *see, e.g.*, *Tumbarella*, 271 N.W.2d at *288 (finding plaintiff was detained where "two men confronted her, stated that they were police and security officers," made "menacing gestures" along with "threats of prosecution

20

and jail."); *Carter v. Shearer*, 596 F. Supp. 3d, 934, 943, 947 (E.D. Mich. 2022) (finding that plaintiff, suspected of trying to make a purchase with a stolen credit card, was restrained when "forced" to wait in the store alongside a security guard and two police officers who took her license and credit card and threatened to arrest her).

To the extent the Johnson-Estelles' claim is that Jackson physically restrained them by pinning them into the corner of the self-checkout area (ECF No. 28, PageID.598–599), this argument is without merit. No one contends that any Defendants touched the Johnson-Estelles or physically intimidated them. And the thrust of the Johnson-Estelles' testimony at their depositions was that they were concerned about the potential consequences of leaving—not that they were physically restricted from doing so.

For these reasons, Defendants are entitled to summary judgment on the Johnson-Estelle's false imprisonment claim.

## IV.

The Court hereby DISMISSES Plaintiff's Title VII claim (Count I) and Intentional Infliction of Emotional Distress claim (Count IV) pursuant to Federal Rule of Civil Procedure 41(a)(2).

The Court further GRANTS Defendants' motion for summary judgment as to Plaintiffs' false imprisonment claim (Count III) but DENIES summary judgment as to Plaintiffs' ELCRA claim (Count II).

The Court further ORDERS Plaintiffs, following a meet and confer with defense counsel, to amend the complaint to either identify or dismiss the individual "Doe Defendants" consistent with the parties' summary judgment briefing.

IT IS SO ORDERED.

Dated: May 4, 2026

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE